**Olga IGNERI, Individually and as Chairwoman of the Richmond County Republican Committee, Joseph Igneri, and Howard Lim, Jr., Individually and as Chairman of the New York County Conservative Party, and Joyce Lim, Plaintiffs–Appellees,**

v.

**Elizabeth D. MOORE, Chairwoman of the New York State Ethics Commission, and Joseph J. Buderwitz, Jr., Angelo A. Costanza, Norman Lamm and Robert B. McKay, Members of the New York State Ethics Commission, Defendants–Appellants.**

No. 546, Docket 89–7730.

United States Court of Appeals, Second Circuit.

Argued Dec. 6, 1989.

Decided March 15, 1990.

David F. Kunz (DeGraff, Foy, Conway, Holt–Harris & Mealey, Kirk M. Lewis, Albany, N.Y., of counsel), for plaintiffs-appellees.

Denise A. Hartman, Asst. Atty. Gen. (Robert Abrams, Atty. Gen. of the State of N.Y., Peter H. Schiff, Deputy Sol. Gen., Peter G. Crary, Asst. Atty. Gen., Albany, N.Y., of counsel), for defendants-appellants.

Before LUMBARD, NEWMAN, and WINTER, Circuit Judges.

LUMBARD, Circuit Judge:

The question on appeal is whether a New York statute designed to deter political corruption by requiring extensive financial disclosure by political party chairmen violates their constitutional right to privacy. The district court held that it does. We disagree.

Elizabeth Moore, chairwoman of the New York State Ethics Commission, and other Commission members, appeal from the judgment of the District Court for the Northern District of New York, Thomas J. McAvoy, *Judge*, entered on June 28, 1989, declaring unconstitutional Section 73–a of the state's Public Officers Law, N.Y.Pub. Off.Law § 73–a (McKinney 1988), as it pertains to party chairmen and permanently enjoining enforcement of that provision. Plaintiffs-appellees—Olga Igneri, chairwoman of the Richmond County Republican Committee; Howard Lim, Jr., chairman of the New York County Conservative Party; and their spouses—filed their complaint on April 21, 1989, amended on May 25, charging that the section violated their rights to privacy, freedom of association, equal protection, and due process of law. The Commission moved to dismiss the complaint or, alternatively, for summary judg-

ment. Plaintiffs cross-moved for summary judgment. The court held a hearing on June 5 at which plaintiffs presented four witnesses: Igneri, Lim, an attorney with the State Board of Elections, and a state senator. Defendants presented no witnesses. In a memorandum decision and order dated June 27, 1989, Judge McAvoy granted, on privacy grounds, plaintiffs' cross-motion for summary judgment and denied defendants' alternative motions. The court did not reach the other constitutional issues. *See* 721 F.Supp. 406 (N.D.N.Y.1989). We reverse and remand.

## I.

In 1987, as part of a broad-ranging effort to combat political corruption, the New York legislature enacted the Ethics in Government Act, which amended several state statutes. *See* 721 F.Supp. at 407–08. One part of the Act, Section 73–a of the Public Officers Law, requires annual financial disclosure by a variety of officials connected with state government, including political party chairmen. The disclosure applies to the reporting individuals themselves, their spouses, and their unemancipated children. Party chairmen are required to file annually with the New York State Ethics Commission a disclosure form calling for the following information:

* Any "office, trusteeship, directorship, partnership, or position of any nature, whether compensated or not," with "any firm, corporation, association, partnership, or other organization other than the State";
* Any "occupation, employment, trade, business, or profession engaged in";
* Any interest in excess of $1,000 (excluding bonds and notes) in any contract involving a state or local agency;
* Any position as an officer of a political party or organization;
* A description, if applicable, of any law, real estate, or other professional practice (Disclosure of clients, customers or patients is not required.);
* Gifts, other than political contributions and gifts from relatives, in excess of $1,000, and the donor's name and address;
* Reimbursements for office-related expenses, including travel, in excess of $1,000;
* Any interest, and the value thereof if reasonably ascertainable, in any trust, estate, or non-New York State or City retirement plan;
* A description of the terms of any contract relating to employment after leaving the public position, or relating to continued payments from prior employers;
* The nature and amount of income in excess of $1,000, including deferred income and assignments of income;
* The type and market value of securities in excess of $1,000;
* Any ownership interest, in excess of $1,000, in real estate;
* Any notes or accounts receivable in excess of $1,000, including the name of the debtor and nature of the obligation;
* Any personal liabilities in excess of $5,000, including the name of the creditor and the collateral.

N.Y.Pub.Off.Law § 73–a(3) (McKinney 1988 & Supp.1990). Where disclosure of values or amounts is requested, dollar amounts are letter-coded (for example, Category C covers amounts of $20,000 to under $60,000). *See id.* All disclosed information is open for public inspection except the categories of value or amount. *See* N.Y.Exec.Law § 94(17)(a)(1) (McKinney Supp.1990).

The statute defines "political party chairman" to include the chairman of the state committee of a party; the chairman of a county committee where the county population is 300,000 or more or the chairman receives $30,000 or more in compensation or expenses; and persons who perform general managerial functions for county committees where the county population is 300,000 or more or who received $30,000 or more in compensation or expenses. N.Y. Pub.Off.Law § 73(1)(k) (McKinney 1988).

The State Ethics Commission has the duty to enforce the disclosure provisions. Persons who "knowingly and wilfully" fail

to file the required forms, or file forms containing false information with the intent to deceive, are subject to civil penalties of up to $10,000 or criminal prosecution for a misdemeanor. *Id.* at § 73–a(4) (McKinney Supp.1990).

*Non-disclosure and exemption procedures*

Section 94(18) of the state's Executive Law, N.Y.Exec.Law § 94(18) (McKinney Supp.1990), establishes, within the Commission, a "public advisory council." The Council's purpose is to screen requests by persons subject to the filing requirement that the Commission withhold from public inspection any information having "no material bearing on the discharge of the reporting person's official duties." *Id.* at § 94(18)(h)(1). The reporting individual also may request an exemption from disclosure as it pertains to his spouse and any unemancipated children. *Id.* at § 94(18)(h)(2).

Adverse Council decisions may be appealed to the Commission. Section 94(13) of the Executive Law deems the Commission an "agency" within the meaning of the State Administrative Procedure Act (State APA), thereby requiring the Commission to "adopt rules governing the conduct of adjudicatory proceedings and appeals" that "provide for due process procedural mechanisms substantially similar to those set forth in" the State APA. *Id.* at § 94(13). The Commission's decisions are subject to judicial review pursuant to article 78 of the state's Civil Practice Law and Rules, N.Y. Civ.Prac.L. & R. 7801 (McKinney 1981). N.Y.Exec.Law § 94(13) (McKinney Supp. 1990).

According to the Council's statement of "Procedure to Request Deletions or Exemptions from Financial Disclosure," the Council considers the following factors in evaluating a request that certain disclosed information be withheld from public inspection or exempted from reporting: "whether the information is of a highly personal nature, whether it relates in a material way (*i.e.,* in a substantial and important way) to the official duties of the individual[,] and whether the information involves an actual or potential conflict of interest." The application form by which individuals request deletion or exemption requires a statement of the specific nature of the reporting individual's job duties, a statement indicating why the disclosed information has no material bearing on the discharge of official duties, and a completed financial disclosure statement with the objected-to information highlighted. All disclosed information remains confidential while the Council considers the request. N.Y.Exec.Law at § 94(18)(i) (McKinney Supp.1990).

## II.

We address here only the privacy objection, the sole basis for the district court's permanent injunction against enforcement of the disclosure requirement as it applies to party chairmen. Because the complaint, as noted, stated several constitutional grounds in addition to privacy, we remand to the district court for resolution of those issues.

■ The constitutional right to privacy, although difficult to articulate precisely, has been firmly established. *See generally Nixon v. Administrator of General Services,* 433 U.S. 425, 455–65, 97 S.Ct. 2777, 2796–2801, 53 L.Ed.2d 867 (1977); *Whalen v. Roe,* 429 U.S. 589, 598–604, 97 S.Ct. 869, 876–79, 51 L.Ed.2d 64 (1977); *Eisenbud v. Suffolk County,* 841 F.2d 42 (2d Cir.1988); *Barry v. City of New York,* 712 F.2d 1554 (2d Cir.), *cert. denied,* 464 U.S. 1017, 104 S.Ct. 548, 78 L.Ed.2d 723 (1983). In light of the privacy challenge, we assess the statute's disclosure requirement under an intermediate scrutiny, or balancing, analysis. *See Eisenbud,* 841 F.2d at 45–46; *Barry,* 712 F.2d at 1559. As the district court recognized, *see* 721 F.Supp. at 411, the statute is valid if, after balancing the State's interest in financial disclosure against the chairmen's interest in keeping the disclosed information private, it appears that disclosure "is designed to further a substantial governmental interest and does not land very wide of any reasonable mark in making its classifications." *Eisenbud,* 841 F.2d at 46. The burden of

proof is placed on the State to demonstrate that the balance weighs in its favor.[1]

The State argues, first, that party chairmen play important roles in public affairs and that disclosure of their finances furthers its interest in deterring corruption and conflicts of interest, and second, that the demonstrated benefits outweigh any intrusion upon the chairmen's privacy.

## A. *The Role of Party Chairmen*

■ The district court focused largely on the duties of party chairmen as described by state law. After reviewing the provisions of the state's Election Law, the court observed that the chairmen are neither "involved in the daily operations of government" nor guardians of "any public trust." 721 F.Supp. at 414. "[G]iven the duties imposed and the authority granted by State law," the court stated, "the relationship between the requirement that county committee chairpersons of private political parties file annual disclosure statements and the purposes of the Act ... is at best tenuous...." *Id.* at 412–13.

We disagree. First, party chairmen play a substantial and discernible role in state government beyond their statutorily enumerated duties. Several of our recent decisions demonstrate in detail the extent to which party chairmen can adversely influence governmental processes. In *United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983), we upheld the conviction of the former chairman of the Republican Committee of Nassau County and the Town of Hempstead under the federal mail fraud statute, 18 U.S.C. § 1341

(1976). In so holding, we concluded, in part, that Margiotta owed a fiduciary duty to the general citizenry based on his "participation in" and "effective control over the processes of government." 688 F.2d at 125. We noted further that Margiotta played "more than a limited role in giving political clearance for certain high-level appointments" and "dominated the administration of several basic governmental functions." *Id.* at 127. Likewise, in *United States v. Friedman*, 854 F.2d 535 (2d Cir. 1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989), we termed Friedman, chairman of the Bronx Democratic Committee and a former deputy mayor, "one of New York City's most influential politicians." *Id.* at 548. The record in that case, we concluded, showed that Friedman had "exerted his influence to expedite consideration" of a prospective government contract in which he was interested. *Id.* at 549.

A similar concern for the exercise of improper influence by party leaders underlay our recent decision upholding New York's Serrano Law, which in part bars from membership on New York City community school boards persons who hold "any elective or appointed party position." *Fletcher v. Marino*, 882 F.2d 605, 608 (2d Cir.1989), quoting N.Y. Education Law § 2590–c(4) (McKinney 1981 and Supp. 1989). We rejected plaintiffs' first amendment challenges to the statute as they pertained to party officers because the statute imposed a relatively light burden on the political process and resulted in the relatively great benefits of improving voter confidence and preventing misconduct.

---

**1.** Although the district court did not address the issue, it apparently placed the burden on the State. The opinion stated, for example, that "defendants [the State] have failed to explain" how disclosure will deter political corruption, 721 F.Supp. at 416, and that "it has not been shown how financial disclosure here will further the interests identified and relied upon by the State," *id.* at 413.

There has been little discussion, in the opinions of this court or the Supreme Court, of the allocation of the burden of proof in intermediate scrutiny cases. In one such case, involv-

ing alleged gender discrimination, the Court stated: "Our decisions also establish that the party seeking to uphold a statute that classifies individuals on the basis of their gender *must carry the burden* of showing an 'exceedingly persuasive justification' for the classification." *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982) (emphasis added), quoting *Kirchberg v. Feenstra*, 450 U.S. 455, 461, 101 S.Ct. 1195, 1199, 67 L.Ed.2d 428 (1981). *See also Heckler v. Mathews*, 465 U.S. 728, 744–45, 104 S.Ct. 1387, 1397–98, 79 L.Ed.2d 646 (1984).

882 F.2d at 613–14.[2]

Second, testimony from plaintiffs' own witnesses supports a finding that the chairmen wield great influence. Although Olga Igneri, a Republican chairwoman, denied having any influence herself over elected Republican officials, she conceded the following on cross-examination:

Q. Are you aware that there are political chairs other than yourself who, in fact, influence the appointment of state officers?

A. Yes, I am aware.

Q. And who, in fact, assist contractors in obtaining contracts with municipal government?

A. Yes, I am aware.

Q. And are you aware of political party chairmen who have worked as a personnel office, so to speak, in deciding who should be promoted within state or county government?

A. Absolutely.

Igneri likewise suggested in an affidavit that while most political parties in New York City have little influence, "the democratic county chairmen" wield "significant power or voice in the important decisions of the elected government of the City of New York." Howard Lim, Jr., chairman of the New York County Conservative Party, also denied having any ability to influence the actions of elected officials but agreed with Igneri that many party chairmen have such abilities, often because they are "long time social acquaintances with the people that they hold influence over."

Other analyses of the role of party chairmen bear out these conclusions. In a January 1987 report, the State–City Commission on Integrity in Government (the Sovern Commission) observed, with respect to the benefits of financial disclosure in deterring conflicts of interest: "When, for example, political party leaders make profitable contracts with government, who is going to believe that everything is on the up and up? That kind of behavior creates a climate that demoralizes the strong and seduces the weak into their own forms of corruption." Volume 1: Reports and Recommendations 11 (1987). And although Thomas Zolezzi, special counsel to the New York State Board of Elections, and Martin Connor, a Democratic state senator from New York City, both testified before the district court that party chairmen have little power inherent in their office, they nonetheless confirmed the Sovern Commission's conclusion that some chairmen have influence great enough to affect legislation and the conduct of elected officials.[3]

Concerns about the pervasive influence of party chairmen underlay the legislature's outright restrictions on chairmen's activities contained in the Public Officers Law. Section 73(4)(a) in part prohibits party chairmen from selling "any goods or services having a value in excess of twenty-five dollars to any state agency." N.Y.Pub. Off.Law § 73(4)(a) (McKinney Supp.1990).

**2.** For other examples of the abuse of influence by party chairmen, see, e.g., *McNally v. United States*, 483 U.S. 350, 352, 107 S.Ct. 2875, 2877, 97 L.Ed.2d 292 (1987) (chairman of Kentucky Democratic Party had *"de facto* control over selecting the insurance agencies from which the Commonwealth would purchase its policies"); *United States v. Asher*, 854 F.2d 1483 (3d Cir. 1988), *cert. denied,* — U.S. —, 109 S.Ct. 836, 102 L.Ed.2d 969 (1989); *United States v. Smith,* 839 F.2d 175 (3d Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1936, 104 L.Ed.2d 408 (1989).

We emphasize, moreover, that these cases constitute examples only of criminal abuses by chairmen of their influence. Rather than detailing generally the larger phenomenon of legitimate, but *potentially* unethical or unlawful use of power by chairmen, the cases reflect only influence gone awry.

**3.** It is likely that the state would have marshalled its own evidence had it presented the witnesses it hoped at the hearing before Judge McAvoy rather than refusing the court's offer of a continuance. Judge McAvoy asked defendants-appellants' counsel whether he wanted a continuance to allow him to present his two expert witnesses, a professor from the State University of New York at Albany and a chapter president of the League of Women Voters. When Judge McAvoy stated that the hearing was not a consolidated trial on the merits, counsel replied that he was willing to rely on the existing record "for purposes of responding to the plaintiffs' motion for *preliminary injunction"* (emphasis added). Both parties submitted written exhibits at the hearing and later submitted briefs. On June 27, Judge McAvoy granted *summary judgment* and a *permanent* injunction.

The prohibition applies as well to firms or associations "of which such person is a member" and corporations of which the person owns or controls ten percent of the stock. *Id.* Subsection (b) similarly restricts party chairmen of counties wholly included in cities with populations greater than one million. *Id.* at § 73(4)(b). Additionally, Section 73(7) prohibits party chairmen from appearing or rendering services in a variety of "case[s], proceeding[s], application[s] or other matter[s] before a state agency," *id.* at § 73(7)(a) (McKinney 1988), other than "in connection with a ministerial matter," *id.* at § 73(7)(c), or in cases where the chairman acts "in an official capacity," *id.* at § 73(7)(f). Section 73(9) bars all party officers, including county chairmen, from holding judicial or certain law enforcement positions, *id.* at § 73(9).

Appellees' argument that chairmen are not public officials and have no express role in state government—as compared, for example, to legislators or civil servants—is quite beside the point. The legislature's concern over corruption and conflicts of interest went beyond the chairmen's ministerial functions in the operation of the electoral process. *See generally* N.Y.Elec.Law §§ 2–100 to 2–127 (McKinney 1978 and Supp.1990). Rather, the state was wary of party officials capitalizing on their special relationships with those who do perform substantial official duties and currying favor for themselves and their associates. While the relationships between the chairmen and elected officials and civil servants surely are not, in all cases, "symbiotic," as appellants characterize them, they are sufficiently close in enough cases, or are at least potentially so, to warrant the legislature's concern with improper peddling of their influence.

We reached a similar conclusion in *Kaplan v. Board of Education*, 759 F.2d 256 (2d Cir.1985), a case involving a challenge to a regulation of the New York City schools chancellor requiring elected but unsalaried school board members to file financial disclosure forms. The board members argued, in part, that their limited duties diluted any legitimate state interest in their finances. Noting the pervasive opportunities for board members to be corrupted, as well as the significant *de facto* power they exercised, we held that disclosure furthered the "legitimate legislative objective to deter and detect possible corruption." *Id.* at 262. We rejected the members' privacy objections, which we said "must yield" to "the important state interest" the regulation furthered. *Id.*

Appellees argue that because the notion of "influence" is "unprincipled and standardless," the state in the future could require "any person capable of delivering a large bloc of votes, or contributing large sums of money" to disclose their finances. We are not persuaded by the specter of this "slippery slope." There is little similarity between party chairmen and those "capable of delivering a large bloc of votes." Party chairmen and the machinery they command have apparent and specific roles in state and local government that are subject to abuse. To be sure, their influence, at least with respect to elected officials, may stem in large part from their ability to sway voters one way or the other. But as the holders of an official party post, chairmen are a step beyond the mere influential voter: They have the ability to convey the party's imprimatur and, in some cases, to allocate its funds.[4] The disclosure requirement in this case, we believe, is sufficiently principled and circumscribed to withstand the chairmen's speculative and overstated fears. *Cf. Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam) (*inter alia*, upholding requirements that "political committees" disclose the name, occupation and principal place of business of large donors).

## B. *The Effect of Financial Disclosure*

■ Having concluded that party chairmen generally possess or potentially possess great influence on public affairs, our

---

**4.** The Rules and Regulations of the Republican County Committee for New York County, enacted in 1987, provide, for example, that the chairman is "the principal political, executive and administrative officer of the County Committee" and has "the power to disburse all funds."

next inquiry is whether their financial disclosure furthers the substantial state interest in exposing and curbing the improper uses of that influence. We believe it does.

In *Barry*, 712 F.2d at 1560, we noted that financial disclosure statutes "reflect the not unreasonable judgment of many legislatures that disclosure will help reveal and deter corruption and conflicts of interest." The disclosure law challenged in *Barry* required that New York City officials, candidates for city office, and city employees whose salary was $30,000 or more annually make public certain financial information. The district court, in upholding the provision against objections that it violated the right of privacy, observed:

> [T]he objectives sought by financial disclosure laws are in principle unassailable and theoretically justify a broad scope of inquiry. Honest government is so patently a worthy objective, and the capacity for venality in human behavior is so profound and ingenious, that virtually any disclosure law however intrusive might be rationally justifiable.

*Slevin v. City of New York*, 551 F.Supp. 917, 921 (S.D.N.Y.1982), *aff'd in part and rev'd in part sub nom. Barry v. City of New York*, 712 F.2d 1554 (2d Cir.), *cert. denied*, 464 U.S. 1017, 104 S.Ct. 548, 78 L.Ed.2d 723 (1983). The Supreme Court, for similar reasons, recognized the benefits of broad financial disclosure in federal election campaigns. *See Buckley*, 424 U.S. at 64–68, 96 S.Ct. at 656–58; *see also id.* at 236, 96 S.Ct. at 735 (Burger, C.J., concurring in part and dissenting in part).

The same principles apply here. Full disclosure ensures that the financial interests of party chairmen—the interests most susceptible to the corrupting force of political power and influence—are available for inspection by state regulators and the concerned citizenry. Financial disclosure functions not merely to subject private persons' finances to public scrutiny but as a means to deter those who might unethically capitalize on their political relationships. Accountability follows publicity. In the classic formulation of Justice Brandeis: "Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman." L. Brandeis, Other People's Money and How the Bankers Use It 62 (National Home Library Foundation ed. 1933).

The disclosure mandated by Section 73–a is a sturdy deterrent precisely because it encompasses more than mere earnings and salary information. Party chairmen must reveal, with some exceptions, the sources of their income as well as the amounts. This ensures that state regulators and the public have access to data with which to evaluate alleged influence peddling. By extension, it helps foster an atmosphere in which such unethical activity becomes less likely and less tolerated precisely because it is more discoverable. As Governor Cuomo stated in approving the legislation:

> Favoritism and the potential for conflicts of interest, as well as the mere appearance of such, serve to weaken and erode the public's trust and confidence in government.... [The] financial disclosure requirements ... assure that the public is aware of all private and business interests which may influence public officers and employees in their official acts.

Governor's Program Bill Memorandum, Bill Jacket for L.1987, ch. 813. Were the regulation any less burdensome, it would be that much less effective in achieving the legislature's objectives.

We are further persuaded that the statute presents no constitutional infirmities because of the extensive protection it provides to those officials who prefer, for valid reasons, that their disclosed information not be made public. The letter-coding of the dollar amounts in the reports and the fact that dollar amounts are not publicly disclosed are privacy safeguards. More important, the statute allows for exceptions and, in the case of spouses and unemancipated children, for exemptions, for information having "no material bearing" on the reporting person's duties and posing little danger of conflict of interest. *Cf. Barry*, 712 F.2d at 1561–64; *Kaplan*, 759 F.2d at 262.

Additionally, the party chairmen have forgone their right to privacy, albeit to a limited degree, by deliberately entering the political arena. Party membership is voluntary, as is the decision of any member to seek and accept the chairmanship. A chairman's responsibilities, even if only administrative, necessarily implicate political relationships by virtue of the nature of political parties, which are intimately concerned with issues of state and municipal governance. And parties function as much more than mere think tanks or political "clubs": They nominate and run candidates for office and are essential actors in the elective process. We think the privacy claim, viewed in this light, is at best no stronger than that of the municipal employees or school board members whose disclosure requirements we have previously upheld. *See Barry,* 712 F.2d 1554; *Kaplan,* 759 F.2d 256.

We conclude that the financial disclosure requirement of Section 73–a, as it pertains to party chairmen, furthers a substantial state interest in deterring corruption and exposing conflicts of interest. Although it accomplishes this purpose by publicizing private information, the state interest is sufficiently strong, and the privacy intrusion is sufficiently limited by the protections provided in the statute, that the balance tips in the statute's favor.

### III.

Having decided to reverse the district court's grant of a permanent injunction against enforcement of Section 73–a on privacy grounds, and to remand for further proceedings on appellees' other constitutional objections, we next address appellees' request that the statute be preliminarily enjoined pending such proceedings. We decline to do so.

It is "the well settled law of this Circuit" that a party seeking a preliminary injunction must establish two things: (a) irreparable harm absent the injunction and (b) either probable success on the merits or sufficiently serious questions on the merits to make them a fair ground for litigation plus "a balance of hardships tipping decid-

edly" in its favor. *Kaplan,* 759 F.2d at 259. Appellees' asserted irreparable harm is the infringement of their privacy rights that would occur from even a temporary enforcement of the statute. Our earlier rejection of the privacy contentions on the merits defeats this claim.

The claims that the disclosure provisions violate plaintiffs-appellees' rights to freedom of association, equal protection and due process received scant attention at the hearing and Judge McAvoy expressly did not address them in his opinion. Consequently, we remand the case to the district court for further consideration of those claims.

### IV.

In sum, we reverse the district court's denial of defendants-appellants' motion for summary judgment and the court's grant of plaintiffs-appellees' cross-motion. We remand the case for further proceedings with regard to plaintiffs-appellees' other claims for relief.

Reversed and remanded.