**SECTOR ENTERPRISES, INC., Michael P. McMahon and Terry M. Parks, Plaintiffs,**

**v.**

**John D. DiPALERMO, Deputy Commissioner of the New York State Department of Social Services, et al., Defendants.**

No. 87–CV–1585.

United States District Court, N.D. New York.

Dec. 26, 1991.

---

Peter Henner, Albany, N.Y., for plaintiffs.

Robert Abrams, Atty. Gen. of State of New York (Judith I. Ratner, Asst. Atty. Gen., of counsel), Albany, N.Y., for defendants.

## MEMORANDUM–DECISION AND ORDER

McCURN, Chief Judge.

Plaintiffs commenced this action pursuant to 42 U.S.C. §§ 1983, 1985(3), and 1988, and N.Y. Const. art. 1, §§ 6 and 11. When this suit was filed in 1987, plaintiffs were two New York State employees and the corporation for which they are principals.[1] The defendants were ten officials of the New York State Department of Social Services.[2] Plaintiffs alleged that the defendants violated their First Amendment right to free speech, their Fourteenth Amendment rights to equal protection and due process, and their rights to equal protection and due process as guaranteed by the New York State Constitution. Defendants have denied the allegations.

On March 10, 1989, this court issued an order dismissing plaintiff's claims insofar as they were brought:

(1) under 42 U.S.C. § 1985(3);

(2) under the due process clause of the Fourteenth Amendment; and

(3) under the First Amendment, against the defendants in their individual capacities.

Thus, remaining before the court are the following claims:

(1) First Amendment, against defendants in their official capacities only;

(2) equal protection (Fourteenth Amendment), against defendants in their individual *and* official capacities; and;

(3) pendent state constitutional claims, against defendants in their individual *and* official capacities.

Defendants now move for summary judgment on the remaining claims. Plaintiffs cross-move for summary judgment on their First Amendment claim. For the reasons stated herein, defendants' motion for summary judgment is granted in its entirety. Plaintiffs' motion for partial summary judgment is therefore denied.

## I. FACTS

### A. *Parties and Background*

In 1986, plaintiffs Terry Parks and Michael McMahon were employed by the New York State Department of Social Services ("DSS"), in the Division of Information Technology Management. Parks was a data base programmer/analyst in the department; McMahon was a project assistant. The defendants were Parks's and McMahon's superiors at DSS.[3]

DSS operates the New York State Child Support Management System ("CSMS"). CSMS is an elaborate, computerized "management information system" which is designed to, *inter alia*, assist state and local social service agencies in obtaining federal reimbursement for payments they make for child support. The system is highly regarded in the field of child support management; as of 1986, eleven states had either expressed an interest in, or were otherwise considering, adopting versions of the New York CSMS. Pl.Mem. at 3–4.

---

**1.** Plaintiff Terry Parks has since resigned from his position with New York State.

**2.** Defendant Cesar Perales recently resigned from his position as Commissioner of the Department of Social Services. The effect of his resignation on this lawsuit will be discussed *infra*.

**3.** For simplicity, the defendants will hereinafter be referred to as the "State," although the court notes that the State of New York is itself not a party to this action.

As a project assistant, McMahon supervised the transmissions of daily checks and reports into the CSMS, and monitored the interaction of the CSMS with other units within DSS. Parks asserts that although he was responsible for maintaining several data bases, including the data base used for the CSMS, he had no direct involvement in the maintenance or operation of the CSMS itself during his tenure with DSS.[4] Regardless of the exact nature of their duties, one can safely conclude that both McMahon and Parks understand the complexities of implementing and operating the CSMS.

In June, 1986, Parks and McMahon formed plaintiff Sector Enterprises, Inc. ("Sector"). Parks is president of Sector, McMahon is vice-president. Parks and McMahon have been and continue to be the only officers of Sector.[5] They formed Sector for the primary purpose of selling their technical expertise with the New York CSMS to other states and governmental agencies which are considering implementing the system. As described in the complaint,

> Sector Enterprises seeks to assist states and governmental agencies other than New York in installing the CSMS and adapting it to the other states [sic.] computer system, inputing the data necessary for running the system, training the data processing staff and the user community, and assisting the state or governmental agency in obtaining reimbursement from the Federal Government for the statutorily provided reimbursement from the Federal Government.

Complaint ¶ 16.

When they assumed their new positions with Sector, Parks and McMahon knew of New York's laws and regulations governing outside employment by state employees. *See* Pl.Mem. at 6. Specifically, New York Public Officers Law §§ 73 (repealed 1989) and 74 regulated commercial and other outside activities of state employees; these sections severely limited, if not prohibited, state employees' ability to engage in outside employment which has the potential to conflict with their state employment. *See generally* N.Y.Pub.Off.L. §§ 73 (repealed 1989), 74 (McKinney 1988). In addition, in 1985 defendant Perales—then-Commissioner of DSS—promulgated separate regulations concerning outside employment by DSS employees in particular. Pursuant to the commissioner's regulations, all DSS employees in "Grade 18" or above, including plaintiffs herein, were required to obtain written approval from their superiors as a prerequisite to performing outside employment.[6] *See* Complaint exh. "A" (Perales memorandum) and "B" ("Manager's Guide"), describing new DSS regulations. The superiors from whom Parks and McMahon needed to obtain approval included some of the defendants in this action.

## B. Controversy giving rise to this litigation

In accordance with the DSS regulation, in June, 1986 Parks and McMahon took steps to secure approval for their participation in outside employment on behalf of Sector. They submitted their request for approval in anticipation of their attendance on behalf of Sector at a conference sponsored by the American Public Welfare Association ("APWA conference"). Parks's and McMahon's attendance at the conference, scheduled to take place in September,

---

**4.** There is some dispute as to the extent of Parks's and McMahon's contact with CSMS. In considering defendants' motion for summary judgment, however, the court is obliged to view the facts in a light most favorable to the plaintiffs. *See, e.g., Anderson v. Liberty Lobby,* 477 U.S. 242, 247–52, 106 S.Ct. 2505, 2509–12, 91 L.Ed.2d 202 (1986). Therefore, this recitation of facts is derived in large part from the allegations set forth in plaintiffs' complaint and affidavits. The court makes no comment with respect to the credibility of the facts presented,

and notes that the defendant has denied many of the allegations stated herein.

**5.** Since Parks and McMahon are the only officers or shareholders of Sector, references hereinafter simply to "Parks and McMahon" as plaintiffs incorporates Sector as a plaintiff.

**6.** Plaintiffs have not challenged the validity of the Commissioner's enactment, and so the court will not discuss issues relating thereto.

1986, would allow them to form contacts with people who would likely seek Sector's services in implementing a CSMS.

The parties have outlined in intricate detail the procedures Parks and McMahon followed in seeking permission to engage in outside employment, and to attend the APWA conference in particular. By all accounts, Parks and McMahon followed the proper channels in applying for leave, but the State nonetheless denied their persistent requests for approval. The State even denied their requests to take personal vacation time to attend the conference. Parks and McMahon ignored the State's orders and attended the APWA conference, prompting the State to sanction them for insubordination. Since then (September, 1986), Parks and McMahon have adhered to the State's directives and refrained from acting on Sector's behalf while employed by the State, thus rendering Sector a virtual nullity. Meanwhile, Sector's sole competitor, UNISYS Corporation, has had free reign to control the lucrative CSMS market, unilaterally courting the business of the eleven states and various other governmental entities that are considering implementing versions of the New York CSMS.

The State has consistently maintained that its refusal to allow Parks and McMahon to pursue their proposed activity is grounded in its belief that the endeavor would create a conflict of interest with Parks's and McMahon's duties at DSS. Beyond expressing concern about the time constraints required by their participation in Sector, the State has noted, *inter alia,* the appearance of impropriety created by Parks's and McMahon's plans:

> The state's interests in preventing tainted decision-making, protecting the integrity of its public officials, preserving confidence in government by avoiding the appearance of impropriety and maintaining the efficiency of its employees are all not less significant during plaintiffs' advertising campaign.... Plaintiffs' advertising of the same services they perform for the Department while employed by the Department, creates opportunities for plaintiffs to make decisions based on plaintiffs' private financial interests, affects plaintiffs' efficiency and appears improper.

Def.Mem. at 19–20 (citation omitted) (footnote omitted).

Parks and McMahon brought this suit in 1987, seeking monetary relief for the State's alleged unconstitutional denial of their professed right to solicit business, while in the State's employ, on behalf of Sector.

## II. DISCUSSION

As stated above, *see supra* p. 238, this court's March, 1989 ruling leaves in issue only those claims relating to the First Amendment, equal protection clause, and state constitutional rights. The State moves for summary judgment on all remaining claims; plaintiffs cross-move for summary judgment on their First Amendment claim. Each remaining claim will be discussed *seriatim.*

### A. First Amendment

The State urges the court, as a preliminary matter, that the activity at issue in this case, *to wit* Parks's and McMahon's work on behalf of Sector, is not "speech" within the reach of First Amendment protection. The State contends that the proposed activity here is "conduct," and as such is not entitled to First Amendment protection.

■■■ Ordinarily, a court must make a threshold determination as to whether the activity in question constitutes speech and is thus entitled to First Amendment protection. *E.g. Central Hudson Gas & Elec. Co. v. Public Serv. Comm'n,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980). Even assuming that Parks's and McMahon's activity in question here is speech, however, the court nonetheless finds that the State's restrictions thereon are constitutional. Under the circumstances, therefore, the court need not formally resolve the speech/conduct issue. *See Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3068–69, 82 L.Ed.2d 221 (1984) (assuming, but not deciding, that the activity

in question was speech); *United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968) (same). For purposes of this discussion, the court will assume that Parks's and McMahon's proposed activity here is "speech." [7]

### 1. Applicable standard

■■■ The degree of First Amendment protection to which speech is entitled, and consequently the standard by which a court reviews governmental restrictions thereon, usually depends upon the nature of speech being regulated. Commercial speech, for example, is entitled to markedly less protection than noncommercial speech. *E.g. Board of Trustees v. Fox*, 492 U.S. 469, 109 S.Ct. 3028, 3033, 106 L.Ed.2d 388 (1989) (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978)); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759, 105 S.Ct. 2939, 2945, 86 L.Ed.2d 593 (1985)). All parties here acknowledge that, assuming the proposed activity here is speech, it is "commercial speech." *See* Pl. Mem. at 22–24; Def.Mem. at 17. Considering the long line of cases holding that solicitation of business constitutes commercial speech, *see, e.g., Fox*, 109 S.Ct. at 3031; *Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986); *Virginia Pharm.*, 425 U.S. 748, 762, 96 S.Ct. 1817, 1825–26, 48 L.Ed.2d 346 the court agrees with the parties' characterization.

■■■ Contrary to the parties' submissions, however, the analysis traditionally employed to review governmental restrictions on commercial speech is inapplicable here. This is because the Supreme Court has instructed, in a series of cases, that speech which is ordinarily entitled to First Amendment protection may be subject to different rules when the speech is restricted solely on grounds that the speaker is a public employee. *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *see also Mount Healthy City Bd. Of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). These cases, often referred to as the *"Pickering"* line of cases, stand for the proposition that government must be able to maintain a productive employment setting. While the commercial speech right of private citizens would normally be reviewed under the four-part test set forth in *Central Hudson Gas & Elec. Co. v. Public Serv. Comm'n*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), the commercial speech rights of public employees is governed by the standards set forth in *Pickering*.

■■■ The rationale behind applying *Pickering* analysis to speech by public employees is based upon the Supreme Court's recognition that government's "dual role" as an employer creates a tension between two conflicting interests. On the one hand, the government cannot condition employment on a basis that infringes upon the employee's constitutionally protected interest in freedom of expression. *E.g. Connick*, 461 U.S. at 142, 103 S.Ct. at 1687 (citations omitted); *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734. In other words, speech which is "protected speech" outside the employment context does not automatically lose its protection when the speaker assumes government employment. *Rankin*, 483 U.S. at 383, 107 S.Ct. at 2896 (citing *Perry v. Sindermann*, 408 U.S. 593,

---

**7.** The court notes in passing that plaintiffs' proposed activity on behalf of Sector amounts to little more than soliciting business. Soliciting business, which is akin to advertising, is "speech," provided that the solicitation is not misleading and relates to a lawful activity. *See, e.g., Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466, 108 S.Ct. 1916, 1924, 100 L.Ed.2d 475 (1988) ("the First Amendment protects the right to solicit legal business …"); *Central Hudson Gas*, 447 U.S. at 566, 100 S.Ct. at 2351 ("lawful and not misleading" requirement); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761–65, 96 S.Ct. 1817, 1825–27, 48 L.Ed.2d 346 (1976) (hereinafter *"Virginia Pharm."*) (commercial speech is entitled to First Amendment protection). Hence, if forced to decide the issue, the court would likely conclude that plaintiffs' proposed activity here is speech within the meaning of the First Amendment.

92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)). On the other hand, the nature of the workplace is such that there are times when the government, in its role as employer, must be able to exercise control over the work environment. *Pickering*, 391 U.S. at 570 n. 3, 88 S.Ct. at 1735 n. 3, 88 S.Ct. at 1735 n. 3. In these situations, otherwise protected speech can lose its protected status. As the Second Circuit recently noted, "the government has a legitimate interest in regulating the speech of its employees that differs significantly from its interest in regulating the speech of people in general." *Piesco v. City of New York*, 933 F.2d 1149, 1155 (2d Cir.1991). In sum, a separate set of constitutional rules apply when the sole basis for restrictions on speech is the speaker's status as a public employee.

█ The State argues that *Pickering* is not applicable to cases such as the present, in which the speech in question is commercial speech. The rationale behind *Pickering* and its progeny, however, compels the conclusion that *Pickering* analysis applies with equal force to commercial speech. It is difficult to fathom why the government's need to control its places of work would be less when the employee's speech is commercial, as opposed to non-commercial. Not surprisingly, the *Pickering* line of cases is devoid of any suggestion that employees' commercial speech should be treated any differently than their noncommercial speech. The rationale behind *Pickering* is as justifiable in the commercial speech setting as it is in the noncommercial speech setting.

█ *Pickering* analysis is appropriate here because the purported speech at issue, *to wit* Parks's and McMahon's solicitation of business, would clearly receive First Amendment protection but for the fact that it was to be uttered by state employees. *See generally, e.g., Virginia Pharm.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346. The State's sole reason for suppressing Parks's and McMahon's speech is that the proposed solicitation of business creates a

conflict of interest and, therefore, interferes with their ability to satisfactorily discharge their duties of employment. In other words, Parks's and McMahon's employment with the State provides the sole basis for the restriction on their speech. In this sense, the State's objection to the speech is really no different from those considered by the Supreme Court in the *Pickering* line of cases. *See Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734; *Connick v. Myers*, 461 U.S. at 141, 103 S.Ct. at 1686–87; *Rankin v. McPherson*, 483 U.S. at 390, 107 S.Ct. at 2900. Since the State's argument turns on the theory that Parks's and McMahon's employment with the state places their otherwise protected speech at a point beyond the reach of First Amendment protection, the court must proceed to analyze the restriction under the standards set forth in the *Pickering* line of cases.

### 2. *Pickering analysis*

*Pickering* requires a "balancing test" to determine whether Parks's and McMahon's state employment should remove their otherwise protected speech from the breadth of First Amendment protection. Under the test, the court must weigh the speaker's interests in commenting upon a matter of public concern against the State's interest in promoting the efficiency of the public services it performs through its employees. *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899 (quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734). The Second Circuit provided further guidance for the balancing in *Giacalone v. Abrams*, when it stated:

> In evaluating the relative weight of the employer's and employee's interests, we also consider whether the speech impaired the employee's ability to perform his duties, disrupted working relationships requiring personal loyalty and confidence, or otherwise impeded the regular operation of the employing agency.

850 F.2d 79, 85 (2d Cir.1988). *See also Piesco*, 933 F.2d at 1155–56; *Vasbinder v. Ambach*, 926 F.2d 1333, 1339 (2d Cir.1991).[8]

---

**8.** The State refers to a "four-pronged test," construed by the Court of Appeals for the District of Columbia Circuit, for undertaking a *Pickering* analysis. *See* Def.Mem. at 24 (citing *Hall v. Ford*, 856 F.2d 255, 258 (D.C.Cir.1988)). The discussion herein will generally address the ele-

Parks and McMahon certainly state a strong case for the public's interest in protecting their right to solicit business on behalf of Sector. Parks's and McMahon's proposed sales of Sector's services to new government agencies would foster competition in the CSMS market, resulting in a more efficient procurement process. The public's interest in economic efficiency should not be underestimated; the Supreme Court has recognized the public's strong interest in protecting speech which promotes efficiency in the marketplace. In *Virginia Pharm.*, most notably, the Court observed that "[a]s to the particular consumer's interest in the free flow of commercial information, that interest may be as keen, if not keener by far, than his interest in the day's most urgent political debate." 425 U.S. at 763, 96 S.Ct. at 1826. Later in the same case, the Court further commented:

> So long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed. *To this end, the free flow of commercial information is indispensable....* And if it is indispensable to the proper allocation of resources in a free enterprise system, it is also indispensable to the formation of intelligent opinions as to how that system ought to be regulated or altered. Therefore, even if the First Amendment were thought to be primarily an instrument to enlighten public decisionmaking in a democracy, we could not say that the free flow of information does not serve that goal.

*Id.* at 765, 96 S.Ct. at 1827 (emphasis added) (citations omitted) (footnotes omitted).

In deciding *Virginia Pharm.*, however, the Supreme Court was not confronted with a situation in which the speaker had a concomitant—if not conflicting—duty of employment to the state. Absent from that case was a need to undertake the entire "second-half" of the *Pickering* analysis, *i.e.* an examination of "the interest of the state, as employer, in promoting the efficiency of the public services it performs through its employees." *Cf. Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734, *cited in Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899; *Connick*, 461 U.S. at 142, 103 S.Ct. at 1687. Therefore, unlike the Court in *Virginia Pharm.*, this court must balance Parks's and McMahon's interests in promoting economic efficiency against the State's interest in controlling its workplaces.

The State argues, and this court agrees, that the State has an overriding interest in preventing the conflicts of interest inherent in Parks's and McMahon's proposed activities. According to the State,

> [t]he government's interests (such as preserving the efficiency and integrity of government service, preserving confidence in government by avoiding the appearance of impropriety and protecting employees from undue influence) are substantial. Regulating employee conflicts of interests is not only reasonable but directly advances these governmental interests. It is undisputed that prohibiting public employees' conflicts of interests, be they political, economic or otherwise, directly promotes the integrity of public service. Such regulation also directly promotes the efficiency of the public service and preserves public confidence by preventing employees from engaging in services which appear improper.

Def.Mem. at 22.

The case authority supports the State's position that the government has a substantial interest in preventing various forms of conflicts of interest in the employment setting. In *United States Civ. Serv. Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) ("*Letter Carriers*"), the

---

ments delineated in *Hall*, but without the rigidity of the suggested test. This court is not alone in so proceeding. While requiring consideration of all of the elements thereof, neither the Supreme Court nor the Second Circuit has specifically described the *Pickering* analysis in terms of a "four-pronged test."

Supreme Court upheld the constitutionality of the Hatch Act, which explicitly conditioned federal employment upon employees' forbearance from active participation in partisan political activities, even during their spare time. To the extent the government purported to suppress employee expression during the employees' spare time, the facts presented in *Letter Carriers* were remarkably similar to those before the court today.

In rejecting the federal employees' First Amendment challenge to the Act, the Supreme Court was persuaded by the "obviously important interests sought to be served by the limitations on partisan political activities now contained in the Hatch Act." *Letter Carriers*, 413 U.S. at 564, 93 S.Ct. at 2889–90; *see also Lefkowitz v. Cunningham*, 431 U.S. 801, 808, 97 S.Ct. 2132, 2137, 53 L.Ed.2d 1 (1977) (stating in *dicta* that "[g]overnment has compelling interests in maintaining an honest police force and civil service ..."). This court places great weight in the fact that the Court in *Letter Carriers* sustained the validity of the Hatch Act's restrictions on *political speech.* This is so influential because the restrictions in the present case affect only commercial speech, to which this court must afford even less First Amendment protection than the speech at issue in *Letter Carriers. See Ohralik*, 436 U.S. at 456, 98 S.Ct. at 1918. *But see Virginia Pharm.*, 425 U.S. at 763, 96 S.Ct. at 1826.[9] If the Supreme Court in *Letter Carriers* was willing to suppress political speech in order to protect the government's interest in avoiding appearances of impropriety, then *a fortiori* this court should be prepared to uphold the State's restrictions on the less-protected commercial speech in furtherance of the identical goal.

Last year, in *Igneri v. Moore*, 898 F.2d 870 (2d Cir.1990), the Second Circuit upheld the constitutionality of New York State's financial disclosure requirement for chairpersons of political parties. The plaintiff in *Igneri* argued that the requirement violated her right to privacy; the court dismissed her argument, because New York State has a "substantial state interest in exposing and curbing the improper uses of ... influence." *Igneri*, 898 F.2d at 877. *See also Slevin v. City of New York*, 551 F.Supp. 917, 921 (S.D.N.Y.1982), *aff'd in part, rev'd in part, sub nom., Barry v. City of New York*, 712 F.2d 1554 (2d Cir.), *cert. denied*, 464 U.S. 1017, 104 S.Ct. 548, 78 L.Ed.2d 723 (1983), in which the court ruled that "[h]onest government is so patently a worthy objective, and the capacity for venality in human behavior is so profound and ingenious, that virtually any disclosure law however intrusive might be rationally justifiable."

The fact that *Igneri*, and for that matter *Slevin* and *Barry*, arose in the privacy—and not First Amendment—context is of little consequence to this discussion. Equally insignificant is the fact that these cases involved conflicts of interest other than the conflict at issue here, *to wit* the outside employment of state employees. The crux of these holdings for our purposes is that governmental entities have a substantial, if not dispositive, interest in preventing conflicts of interest. Furthermore, other circuits have specifically upheld the constitutionality of restrictions on state employees' outside employment, citing the state's interest in preventing potential conflicts of interest. *E.g. Morial v. Judiciary Comm'n*, 565 F.2d 295 (5th Cir. 1977) (upholding requirement that judges resign their positions before announcing

---

**9.** Even in light of the *dicta* in *Virginia Pharm., see supra* p. 14, the commercial speech at issue here simply does not enjoy the same level of constitutional protection as other, noncommercial speech. *See Ohralik*, 436 U.S. at 456, 98 S.Ct. at 1918; *Dun & Bradstreet*, 472 U.S. at 759, 105 S.Ct. at 2945. The Court wrote in *Ohralik:*

> to require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's

guarantee with respect to the latter kind of speech. Rather than subject the First Amendment to such deviation, we instead have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression.

436 U.S. at 456, 98 S.Ct. at 1918.

candidacy for non-judicial office); *Youker v. Gulley*, 536 F.2d 184 (7th Cir.1976) (upholding requirement that official court reporters forego private reporting activities as a condition of their employment).

Parks and McMahon contend that even if there is a state interest in preventing conflicts of interest generally, the state interest is not present here because their proposed activity on behalf of Sector would not create such a conflict. In other words, the State's asserted interest in avoiding conflicts is not directly advanced by the application of the regulation against them in this case.[10]

Parks and McMahon base their argument on two factors. First, while conceding that a conflict would exist if they actually performed services for another state, Parks and McMahon contend that the State here is proscribing them from merely *offering* to perform their CSMS services. According to Parks and McMahon, "there are no inherent conflicts of interests between plaintiffs' state duties, and the nature of the work that they were *proposing* to perform for Sector Enterprises." Pl.Mem. at 30 (emphasis added). Second, Parks and McMahon suggest that there is no conflict of interest for a DSS employee who administers the CSMS system for New York State, to administer the *same* system for another *public* employer outside of the state. *Id.*

■■■ In so arguing, Parks and McMahon fail to recognize that conflicts of interest can appear in many forms, and are not limited to conflicting pecuniary interests. *See Rapp v. Carey*, 44 N.Y.2d 157, 404 N.Y.S.2d 565, 569, 375 N.E.2d 745, 749–50 (Ct.App.1978). In *Goldstein v. Bartlett*, for example, the court opined that multiple conflicts of interest are *inherent* when a state employee purports to act on behalf of an outside venture. That court reasoned:

> [i]nevitably, the exigencies of the private practice and the convenience of private clients require communication and sometimes actual representation, with concom-

itant distraction, during the regular hours ... required to be devoted to the employment; and occasionally the incidental use of official library, telephone and other facilities to accommodate the temporal and other necessities of private practice. Many of the permitted activities ... would normally have to be conducted during daytime business hours. In short, the conflict was inevitable and, indeed, inherent.

*Goldstein*, 92 Misc.2d 262, 401 N.Y.S.2d 706, 709–10 (Sup.Ct.Alb.Cty.1978); *see id.* at 711 n. 4 (citing "number of cases which have affirmed administrative rules prohibiting or restricting 'outside' employment and 'moonlighting' "); *see also Youker*, 536 F.2d at 187 (efficiency of government requires undivided loyalty of employees). Therefore, from the *Goldstein* perspective, this court can conclude that the State's proscription of Parks's and McMahon's work on behalf of Sector directly advances the State's interest in preventing the inevitable conflict created by the limited time and resources available for the employee to perform two jobs.

Even more extraordinary conflicts arise in situations such as the present, in which plaintiffs seek to solicit employment in the exact same field in which they conduct their state employment. In *Letter Carriers*, the Supreme Court announced that avoiding the appearance of impropriety is of "critical" importance to the government: "it is not only important that the Government and its employees in fact avoid practicing political justice, but it is also *critical* that they *appear* to the public to be avoiding it, if confidence in the system of representative government is not to be eroded to a disastrous extent." *Letter Carriers*, 413 U.S. at 565, 93 S.Ct. at 2890 (emphasis added).

The State could reasonably conclude that Parks's and McMahon's proposed activity creates the appearance of impropriety. This is so even though Parks and McMahon seek merely to advertise, and not yet per-

---

**10.** Plaintiffs' challenge might be alternatively phrased as an "as applied" challenge: the State regulations prohibiting outside employment, while facially valid, are unconstitutional *as applied to* plaintiffs' situation in particular, for want of a sufficient state interest.

form, their services. The public can certainly grow suspicious upon learning that state employees are using their taxpayer-financed experience and knowledge in attempts to supplement their incomes while still on the state payroll. And, as in *Goldstein*, the state has an interest in preventing the perception that Parks and McMahon have an unfair advantage in soliciting business in the CSMS market. An unfair advantage could be perceived because, unlike their competitors, Parks and McMahon (as DSS employees) enjoy relatively unfettered access to the state's CSMS operation.

The court in *Goldstein* drew similar conclusions concerning proposed outside employment there. *See Goldstein*, 401 N.Y.S.2d at 710. In *Goldstein*, the court upheld a proscription against outside employment by judicial law clerks, largely because of the public perception that law clerks as practicing attorneys would enjoy an unfair advantage in litigation. *See id.* Certainly the court was also concerned with the perception that the clerk's adversaries would be at a disadvantage when they subsequently appeared in the clerk's court, even on unrelated matters. Although the current situation is not as blatant as that in *Goldstein*, this court similarly has no reason to second-guess the State's fair assessment that the public could question the integrity of DSS when its employees are seen soliciting personal profit through outside ventures while employed by the State in the same field.

In so finding, the court does not rule that Parks's and McMahon's proposed activities are in *direct* conflict with their responsibilities to the State. Rather, the court merely holds that their proposed solicitation of business on behalf of Sector creates an appearance of impropriety which is in itself a conflict of interest. The restrictions at issue here directly advance the State's substantial interest in preventing such conflicts. *Letter Carriers*, 413 U.S. at 565, 93 S.Ct. at 2890; *Goldstein*, 401 N.Y.S.2d at 710; *Forti v. New York State Ethics Comm'n*, 75 N.Y.2d 596, 555 N.Y.S.2d 235, 237, 554 N.E.2d 876, 878 (Ct.App.1990).

In light of the substantial case authority and the underlying policies pertaining thereto, this court concludes that the *Pickering* balancing test weighs in favor of the State's interest in promoting the integrity of, and public confidence in, ethical government. The means chosen by the State to accomplish its ends, *to wit* avoiding conflict of interest, are narrowly tailored to achieve the desired objective. By Parks's and McMahon's own implicit admissions, the restriction here accomplishes the desired objective. After all, the restriction directly prevents Parks and McMahon from partaking in the activity that creates the potential conflict. Moreover, the restriction is not overly broad, in that it does not suppress more speech than necessary. Parks and McMahon still have the right to solicit business on behalf of Sector—but not while employed in their capacities with DSS.

Since the State restrictions at issue here do not unconstitutionally suppress the speech in question, Parks and McMahon cannot maintain their first amendment claim against the State. Accordingly, the State's motion for summary judgment on Parks's and McMahon's claims arising under the First Amendment is granted in its entirety. Plaintiffs' cross-motion for summary judgment on its First Amendment claims is denied with prejudice.

### B. Equal Protection

The Fourteenth Amendment's equal protection clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws...." U.S. Const. amend. XIV. The Supreme Court has interpreted this clause as "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982)).

In order to prove that they are being treated differently than other people who are similarly situated, Parks and McMahon must obviously be able to identify a class of persons to whom they are

similarly situated but less favorably treated. Parks and McMahon readily admit that they are unable to do so. *See* Pl.Mem. at 63 ("even though plaintiffs might not be able to demonstrate that another employee similarly situated has been treated differently ...").[11] Parks's and McMahon's inability to satisfy this rudimentary requirement of equal protection analysis deals a fatal blow to their hope of withstanding the State's motion for summary judgment. *See Cleburne,* 473 U.S. at 439, 105 S.Ct. at 3254.

Parks and McMahon persist in arguing that they can prevail upon establishing that, but for the State's bad faith, they *would* have been able to perform the outside employment on behalf of Sector. In so arguing, they ignore the most fundamental element of an equal protection claim. To establish an equal protection claim, it is not enough to show "bad motive" on the part of the State. Parks and McMahon must show that the State impermissibly treated them differently than it treated other people who are "similarly situated," *i.e.* are in the same class. Since Parks and McMahon have failed to produce a shred of evidence showing such disparate treatment, they cannot withstand the State's motion for summary judgment.

■ Through an exceedingly generous construction of Parks's and McMahon's papers, the court can suppose that they are similarly situated to all other DSS employees who sought approval to partake in outside employment, and that they were treated differently in that they were denied approval on grounds that they sought to compete against UNISYS in the CSMS field. Indeed, at one point in their eighty-two page brief, Parks and McMahon assert that "[s]imilarly situated employees who are seeking to perform similar services which are not in conflict with [UNISYS] are not subject to the type of discrimination that plaintiffs have received." Pl.Mem. at 71–72. Even under such a liberal reading, however, the undisputed facts still require the court to reject their equal protection claim. Parks's and McMahon's arguments are soundly defeated by the fact that the State denied DSS employee Richard Spiers's request to engage in similar CSMS work *on behalf of UNISYS. See* Pl.Mem. at 68 (plaintiffs' admission that Spiers sought to do "the same activities [on behalf of UNISYS] that plaintiffs sought to do" on behalf of Sector). Parks and McMahon expend twelve pages of brief hypothesizing on inferences that can be drawn from select State actions which favored UNISYS. Still, the court cannot fathom how the State can be said to have discriminated against UNISYS's competitors when the State afforded identical treatment class members who sought to work on UNISYS's behalf.

In sum, Parks and McMahon have not satisfied their burden of presenting some evidence to show the existence of a genuine issue of material fact. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.' "); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 322–26, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986). Parks and McMahon have failed to show that they are members of a particular class and that they were treated differently than other members of the same class. Accordingly, the State's motion for summary judgment of Parks's and McMahon's equal protection claims is granted in its entirety.

### C. Remaining pendent constitutional claims

Today's ruling granting summary judgment of all federal claims leaves before the court only pendent state constitutional claims, over which the court has no independent basis for subject-matter jurisdiction. Therefore, in light of today's ruling, plaintiffs' pendent state claims are dis-

11. At oral argument, Parks's and McMahon's counsel again acknowledged his inability to discern class members who have been more favorably treated.

missed pursuant to Fed.R.Civ.P. 12(b)(1), for want of subject-matter jurisdiction.

### III. CONCLUSION

Defendants' motion for summary judgment of plaintiffs' complaint is granted with respect to the claims arising under the First Amendment and the equal protection clause. Plaintiffs' motion for partial summary judgment is denied. Plaintiffs' pendent state law claims are dismissed for want of subject-matter jurisdiction. This ruling therefore disposes of plaintiffs' case in its entirety.

Today's ruling obviates the need to discuss issues relating to (1) defendants' qualified immunity with respect to plaintiffs' equal protection claims, and (2) ex-Commissioner Perales's continuing status in this lawsuit.

IT IS SO ORDERED.