**SANITATION AND RECYCLING INDUSTRY, INC., et al.,**
**Plaintiffs,**

v.

**CITY OF NEW YORK, Defendant.**

**No. 96 Civ. 4131 (MP).**

United States District Court,
S.D. New York.

June 26, 1996.

Rosenman & Colin, LLP by Gerald Walpin, New York City, for Plaintiffs.

The City of New York, Office of the Corporation Counsel by Terri Feinstein Sasanow, New York City.

New York City, Department of Investigation by Richard W. Mark, New York City.

MILTON POLLACK, Senior District Judge.

The police powers of local governments over the waste collection industry are by now an unexceptional element of municipal governance. Control over the regulation of garbage collection is a classic example of municipal police powers reserved to the state and local governments. Courts have upheld the authority of local governments to control local garbage collection in countless cases.

This suit relates to the licensed business of carting companies who remove trade waste in the City of New York under private contracts with business establishments. The plaintiffs are licensed carters of trade waste and sue here for an injunction against the City which, on June 3, 1996, enacted a new licensing law which Plaintiffs allege contains certain facially unconstitutional provisions.[1] This Court denied an application for a temporary restraining order on the ground that Plaintiffs did not establish irreparable damage. A hearing for a preliminary injunction was set for June 25, 1996. The City has countered with a motion for summary judgment in its favor, returnable at the same time. The facts are substantially undisputed.

Carters of trade waste, up until June 3, 1996, were licensed by the City's Department of Consumer Affairs ("DCA") to conduct such business and generally did so under private contracts with business establishments. Local Law 42 has turned over to a newly created agency, the New York City Trade Waste Commission ("the Commission"), the responsibility "for the licensing, registration of businesses that remove, collect or dispose of trade waste." (N.Y.C.Admin.Code § 16–503) ("Code.") The statute provides that "[i]t shall be unlawful for any

---

**1.** New York City Local Law 42 of 1996 ("Local Law 42").

person to operate a business for the purpose of the collection of trade waste ... without having first obtained a license therefor from the Commission," (Code § 16–505(a)), which license "shall be valid for a period of two years." (Code § 16–505(a).)

The new statute authorizes the Commission "after notice and the opportunity to be heard," to "refuse to issue a license to an applicant who lacks good character, honesty and integrity." (Code § 16–509(a).) Likewise, "after due notice and opportunity to be heard," the Commission may "revoke or suspend a license or registration." (Code § 16–513.)

Local Law 42 provides that it "shall take effect immediately." (Local Law 42 § 14.) It also provides, however, that if a business required by the Local Law to possess a license issued by the Commission possessed a license issued under prior law by the DCA, such license shall "remain valid and upon payment of the renewal fee or fee therefor be deemed extended" pending further action or rule making by the commission. *Id.*

The background for the creation of the new Commission and the need for re-examination of the fitness of the existing carter licensees is apparent from the history of the business and the City Council's legislative findings. Those findings state in relevant part:

The council hereby finds that the carting industry has been corruptly influenced by organized crime for more than four decades; that organized crime's corrupting influence over the industry has fostered and sustained a cartel in which carters do not compete for customers and in which customers are compelled to enter into long-term contracts with onerous terms, including "evergreen" clauses; that the anti-competitive effects of this cartel have resulted, with few exceptions in the maximum rates established by the department of consumer affairs effectively being the only rate available to businesses; that businesses often pay substantively higher amounts than allowed under the maximum rate because carters improperly charge or overcharge for more waste than they actually remove; that organized crime's corrupting influence has resulted in numerous crimes and wrongful acts, including physical violence, threats of violence, and property damage to both customers and competing carting firms; that a situation in which New York City businesses, both large and small, must pay a "mob tax" in order to provide for removal of trade waste is harmful to the growth and prosperity of the local economy.

The council further finds that recent indictments have disclosed the pervasive nature of the problem, the structure of the cartel, and the corruption it furthers through the activities of individual carters and trade associations, and that law enforcement must be coupled with new and expanded regulatory efforts on the city's part. The council further finds that despite the efforts of city agencies to regulate the industry under existing laws and regulations, private carting companies have continued to engage in various illegal and anti-competitive practices. The council further finds that unscrupulous businesses in the industry have taken advantage of the absence of an effective regulatory scheme to engage in fraudulent conduct, such as the creation of a lucrative illegal landfill, and to actively discourage new firms from entering the industry. The council therefore finds and declares that in order to provide for the more efficient and lawful conduct of businesses in the carting industry and to protect the public interest, it is necessary to establish a New York City trade waste commission that shall be responsible for the licensing and regulation of businesses in the carting industry.

Enactment of this chapter is intended to enhance the city's ability to address organized crime corruption, to protect businesses who utilize private carting industry with the aim of reducing consumer prices.

(Local Law 42 § 1).

Plaintiffs' Amended Complaint ("Amend. Compl."), filed on June 11, 1996, challenges numerous provisions of the new legislation, and seeks relief on nine claims. Plaintiffs' claims fall generally into three categories. The first category addresses four provisions

of the law enacted to cure the past effects of anti-competitive practices, and eliminate those practices in the future by incorporating term limitations into all contracts between carters and their customers. Such provisions include: a limitation on all trade waste collection contracts to a maximum term of two years (Local Law 42, §§ 11(i) & (ii)); a termination provision effective 30 days after the law's effective date, permitting either party to terminate a contract upon 30 days written notice unless the carter has either received a new license from the Commission or applied to the Commission for a waiver (Local Law 42 § 11(iii)) [2]; a provision allowing a customer to terminate any carting contracts which have been assigned to another carter on 30 days notice (Code § 16–520(e)(ii)); and a provision authorizing the termination of existing carting contracts in special pilot districts to be established in the future (Code §§ 16–504(h), 16–523, 16–524). Plaintiffs allege that these provisions violate the Contract, Takings and Due Process clauses of the Federal Constitution. (Amend.Compl.Claims 1–4.)

The second group of challenges addresses those provisions of the law which grant the Commission the discretionary authority to: (1) require that a licensee enter into a contract with an independent auditor (Code § 16–511) and, (2) waive that provision of the law that renders existing contracts with carters who have not received a new license from the Commission, terminable upon thirty days notice. (Local Law 42 § 11(iii).) Plaintiffs allege that these provisions violate the Due Process clauses of the United States Constitution because they do not provide for notice and an opportunity to be heard before the Commission takes action, and are impermissibly vague. (Amend.Compl.Claims 2, 7).

The final group of challenges addresses those provisions of the law that specify the type of information that the Commission may consider when making licensing determina-. tions. Such provisions include certain business and financial disclosure requirements, and allow for consideration of a license appli-

cant's membership in an indicted trade association or knowing association with criminals or members of organized crime. (Code §§ 16–508, 16–509, 16–520.) Plaintiffs claim that these provisions violate their constitutional right to association and the right to privacy. (Amend.Compl.Claims 5, 6, 8, 9).

### Discussion

■■■ A few preliminary points are in order. As regulation of the garbage collection industry is one of the traditional police powers, the Court is required to "respect the wide discretion on the part of the legislature in determining what is and what is not necessary." *El Paso v. Simmons*, 379 U.S. 497, 508–09, 85 S.Ct. 577, 584, 13 L.Ed.2d 446 (1964), *reh. denied*, 380 U.S. 929 (1965) (citations omitted.) Accordingly, "there is a strong presumption of validity of a statute passed under a state or local government's police power," *Richmond Boro Gun Club, Inc. v. City of New York*, 92 CV 0151, 1995 WL 422014 at *2 (E.D.N.Y.), and parties attacking such statutes on constitutional grounds carry a heavy burden. In the present case, the Court notes that Local Law 42 is geared towards enabling the City to inquire into the fitness of license applicants to participate in the waste collection industry. As such, it is entitled to the deference traditionally given to exercises of a local government's police power.

■■■ In order to obtain a preliminary injunction, the moving party has the burden of showing: (1) irreparable harm, and (2) either a) a likelihood of success on the merits or b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief. *Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964, 967 (2d Cir. 1995). Where a party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme on the ground that it is unconstitutional, the two prongs of the threshold showing required for injunctive relief merge so that, in

---

**2.** By order dated June 10, 1996, the 30–day period following the effective date of the statute was extended to 45 days so as to eliminate the possibility of prejudice to plaintiffs while the Court was engaged in preparing its findings.

order to show irreparable injury, Plaintiffs must show a likelihood of success on the merits. *Turley v. New York City Police Dep't.*, 93 Civ. 8748, 1996 WL 93726 at *3 (S.D.N.Y.). Since Defendant has moved for summary judgment to dismiss the Amended Complaint and there are no genuine issues of fact in dispute, the Court will address the merits of Plaintiffs' claims directly.

 Plaintiffs have brought a facial challenge to the statute. Outside of the First Amendment context, "facial challenges to legislation are generally disfavored." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223, 110 S.Ct. 596, 603, 107 L.Ed.2d 603 (1990). There are only two ways that a party making a facial challenge to a statute can succeed:

> To prevail on a facial attack the plaintiff must demonstrate that the challenged law either could never be applied in a valid manner or that even though it may be validly applied to the plaintiff and others, it nevertheless is so broad that it may inhibit the constitutionally protected speech of third parties.

*New York State Club Ass'n v. City of New York*, 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1 (1988) (citations omitted).

With these principles in mind, the Court will address each of Plaintiffs' contentions in turn.

## I. Contract Clause

Plaintiffs challenge four provisions of Local Law 42 as violations of the Contract Clause of the United States Constitution: (1) the limitation of all carting contracts, including existing contracts, to a maximum term of two years, (2) the authorization of either party to a carting contract to terminate that contract upon 30 days written notice if, by 30 days after the effective date of the law, the carter has neither received a new license from the Commission or applied to the Commission for a waiver, (3) the authorization of customers to terminate, upon 30 days notice, a carting contract which has been assigned to another carter, and (4) the authorization for termi-

nation, in special pilot districts, of carting contracts with licensees other than those licensees selected by the Commission to provide service in those districts.[3]

Plaintiffs argue that these provisions violate the Contract Clause because they "either severely impair or eradicate plaintiffs' vested rights in existing contracts." Defendant responds that New York City's interest in remedying organized crime's "corrupt influence" over the private carting industry justifies the impairment, if any, that the new statute may cause to Plaintiffs' contractual relationships.

██ The Contract Clause provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts...." U.S. Const., Art. I, 10, cl. 1. Although the language of the Contract Clause is facially absolute, this prohibition must be accommodated to the inherent police power of the State "to safeguard the vital interests of its people." *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434, 54 S.Ct. 231, 239, 78 L.Ed. 413 (1934). The Supreme Court "has long recognized that a statute does not violate the Contract Clause simply because it has the effect of restricting, or even barring altogether, the performance of duties created by contracts entered into prior to its enactment.... The Contract Clause does not deprive the States of their 'broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result.'" *Exxon Corporation v. Eagerton*, 462 U.S. 176, 190, 103 S.Ct. 2296, 2305, 76 L.Ed.2d 497 (1983) (citations omitted).

In *Energy Reserves Group, Inc. v. Kansas Power and Light Company*, 459 U.S. 400, 411, 412, 103 S.Ct. 697, 704, 704–05, 74 L.Ed.2d 569 (1983), the Supreme Court established the modern standard for determining if a statute unconstitutionally impairs existing contracts:

> The threshold inquiry is "whether the state law has, in fact operated as a substantial impairment of a contractual relationship ..." In determining the extent of the impairment, we are to consider wheth-

---

**3.** These provisions are found, respectively, in Local Law 42 §§ 11(i) and (ii); Local Law 42 § 11(iii); Code § 16–520(e)(ii); and Code §§ 16–504(h), 16–523, 16–524.

er the industry the complaining party has entered has been regulated in the past ... If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem ... Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of "the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption."

*Id.* (citations omitted).

■ Under the *Energy Reserves Group* test, the first question is thus whether there is a substantial impairment of Plaintiffs' contractual relationships. After analyzing this first question, the Court cannot discount the possibility that the new law will cause substantial changes in contractual relationships. Contract duration will certainly be shortened in many cases and, in other cases, customers may be provided with the right to terminate early. However, this conclusion is tempered by the Supreme Court's sliding scale, which provides that although the level of scrutiny given the law varies *directly* with the severity of the impairment of existing contracts, it varies *inversely* with the degree of prior regulation in a particular industry. *See Chicago Board of Realtors Inc. v. City of Chicago,* 819 F.2d 732, 736 (7th Cir.1987).

As discussed above, the carter-customer relationship is conditioned by the heavily-regulated nature of the industry. *See Presidents' Council of Trade Waste Associations, Inc. v. City of New York,* 142 Misc.2d 135, 536 N.Y.S.2d 656, 660 (Supp.Ct.1988) ("The waste disposal industry is a regulated industry, subject to governmental regulations and licensing provisions"); *USA Recycling, Inc. v. Town of Babylon,* 66 F.3d 1272, 1275 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1419, 134 L.Ed.2d 544 (1996) ("For ninety years, it has been settled law that garbage collection and disposal is a core function of local government in the United States. At their option, cities may provide

garbage pick-up to their citizens directly ... or they may rely on a closely regulated private market to provide those services").

■ In light of this history of regulation, even if there is substantial impairment of existing contracts, the Court must apply a lowered level of scrutiny to the second part of the *Energy Reserves Group* inquiry—the question of whether legitimate and significant purposes support the law. Plaintiffs argue that this case does not present "the kind of 'emergency economic conditions' that will in rare cases permit courts to uphold contractual impairments." Defendant responds correctly that this analysis "overlooks the more recent pronouncements of the Supreme Court ... that the public purpose at issue 'need not be addressed to an emergency or temporary situation.'" (citing *Energy Reserves Group,* 459 U.S. at 412, 103 S.Ct. at 704–05; *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 249 n. 24, 98 S.Ct. 2716, 2725 n. 24, 57 L.Ed.2d 727 (1978); *Veix v. Sixth Ward Bldg. & Loan Ass'n,* 310 U.S. 32, 39–40, 60 S.Ct. 792, 795–96, 84 L.Ed. 1061 (1940)).

The provisions affecting existing contractual relationships were intended by the City Council to remedy the effects of corrupt practices in the carting industry, such as supposed bid-rigging, predatory pricing, boycotts, and "evergreen clauses."[4] The City Council found that these practices have detrimentally impacted the contracting process between carters and businesses:

> The council hereby finds ... that organized crime's corrupting influence over the industry has fostered and sustained a cartel in which carters do not compete for customers and in which customers are compelled to enter into long-term contracts with onerous terms, including "evergreen" clauses; that the anti-competitive effects of this cartel have resulted [in overcharging].

(Local Law No. 42 § 1.)

■ The City Council's stated purpose— to eliminate the influence of corruption and organized crime in an industry—generally

**4.** "Evergreen clauses" provide for automatic renewal of a contract from term to term.

has been held legitimate with respect to garbage carting as well as other industries. *See United States v. Private Sanitation Industry Ass'n*, 44 F.3d 1082, 1084 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 50, 133 L.Ed.2d 15 (1995); *Trade Waste Management Ass'n Inc. v. Hughey*, 780 F.2d 221, 238 (3d Cir.1985); *United States v. International Bhd. of Teamsters*, 745 F.Supp. 908, 913 (S.D.N.Y.1990), *aff'd,* 941 F.2d 1292 (2d Cir. 1991), *cert. denied, Senese v. U.S.,* 502 U.S. 1091, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992). Adjustment of parties' contractual rights because of an improper disparity in bargaining position is a significant and legitimate public purpose. *Acadia Motors, Inc. v. Ford Motor Co.,* 844 F.Supp. 819, 827–28 (D.Maine 1994), *modified on other grounds,* 44 F.3d 1050 (1st Cir.1995) (law protecting automobile dealers from "abusive and oppressive" behavior of manufacturers did not violate Contract Clause). This is particularly true where, as here, the disparity in bargaining position is alleged to have been produced by "crimes and wrongful acts, including physical violence, threats of violence, and property damage to both customers and competing carting firms." (Local Law No. 42 § 1.)

Having concluded that there is a significant and legitimate public purpose to this legislation, the Court must now address the third prong of the *Energy Reserves Group* test—the question of whether the law is reasonable and appropriate in light of its intended public purpose. In conducting this inquiry, since the state is not involved as a contracting party, the Court must "properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *United States Trust Co. v. New Jersey,* 431 U.S. 1, 22–23, 97 S.Ct. 1505, 1518, 52 L.Ed.2d 92 (1977).

The legislature attempted to limit the influence of corruption on carting contracts by adjusting the parties' contractual duties and rights so that contractual terms addressing the duration of contracts are less binding on businesses. The statute accomplishes this purpose by: (1) limiting the terms of all such contracts to two years, (2) providing customers with the option to terminate the contract early if the City refuses to grant that contract a waiver in view of the contract's possible "inconsist[ency] with the purposes of this act" § 11(iii), (3) providing customers with the option to terminate the contract when it has been assigned to another carter, and (4) establishing special districts which will provide data to better analyze the competitive prices of carting in New York City in the absence of control by any "carting cartel."

The specific function of each of these provisions in accomplishing these legislative goals was explained in the testimony to the City Council's Committee on Consumer Affairs on this bill, for example:

> [o]n the issue of length of contracts and the potential determination provision, the reason why both of these elements are important elements in comprehensively reforming this industry is because there has been a history in this industry … of problems in the contracting process, contracts of coercion, contracts of adhesion, long term contracts with onerous terms, excessive price, evergreen clauses that locked in customers and made it impossible for them to get out of contracts. This whole, this was an element of the coercive atmosphere that allowed the carters to do its bidding. Therefore, we consider these to be essential elements in going forward … these are very important provisions to the success of this initiative and they would seriously dilute the bill [if eliminated]. (Testimony of Randy Mastro, Chief of Staff for Mayor Giuliani, to the Council of the City of New York, Committee on Consumer Affairs, May 8, 1996 at 36–38).

Furthermore, there is evidence that the legislative process was responsive to concerns about the bill and that the legislature was willing to revise it to ensure that it better comported with its intended purposes. The law originally limited contracts to one year. In one of the early legislative hearings on the bill, a member of the carting industry argued that this period was too short to yield the results the City desired. *See* Testimony of Philip Angell, Assistant to the Chairman of Browning–Ferris Industries, Inc. to the Council of the City of New York, Committee on Consumer Affairs, December 12, 1995 at 201–02. ("A one-year contract may be too

short and may actually result in higher prices due to heavy start-up costs").

In response to these concerns, the legislation was amended and, at the next legislative hearing, on March 4, 1996, one of the bill's main proponents acknowledged the change:

> In terms of the maximum length of contracts, it was pointed out in the comments that were made that often for economies and for market purposes contracts were longer than one year in duration. We have all agreed on a change so that contracts could be up to two years.

See Testimony of Randy Mastro to the Council of the City of New York, Committee on Consumer Affairs at 8. The legislative process was designed to establish a "reasonable and appropriate" response to legislative concerns over corruption in the garbage carting industry. Therefore, the Court sees no reason to second guess the City Council's informed judgment on this matter. *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 469, 101 S.Ct. 715, 726–27, 66 L.Ed.2d 659 (1987).

In view of the significant and legitimate purposes behind this law and the reasonable means chosen by the City Council to accomplish these purposes, any impairment of contractual relationships the law will produce in the heavily-regulated carting industry does not rise to a level of constitutional concern.

## II. Takings Clause

Plaintiffs challenge these same four provisions based on the Takings Clause of the United States Constitution. Plaintiffs argue that Local Law 42 constitutes a taking because it interferes with carters' reasonable investment-backed expectations by denying them the economically viable use of their contract rights. Defendant responds that any takings claims are untenable "because Local Law 42 'substantially advances legitimate state interests' and does not deprive plaintiffs of all 'economically viable use' of their property."

The Takings Clause provides: "nor shall private property be taken for public use, without just compensation." U.S. Const. Amend. V. The term "private property" includes valid contracts. *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843–44, 78 L.Ed. 1434 (1934). However, as the Supreme Court noted in *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 223–24, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986):

> 'Contracts, however express, cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity. Parties cannot remove their transaction from the reach of dominant constitutional power by making contracts about them.'

> If the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions. For the same reason, the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking.

(citations omitted).

A facial challenge to a statute will succeed if: (1) the statute does not substantially advance a legitimate state interest, or (2) if it denies the owner the economically viable use of his property. *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). With respect to the first requirement, the legitimacy of the public purpose has been discussed above, and need not be repeated at length here.

The second requirement instructs the Court to answer the question of whether the mere enactment of the statute strips the plaintiffs of all or nearly all the value of their property. In answering this question, several factors, typically used on as-applied challenges, but occasionally used on facial challenges, are instructive.[5] Of "particular

---

5. In *Hodel v. Virginia Surface Mining and Reclamation Association, Inc., et. al.,* 452 U.S. 264, 265, 101 S.Ct. 2352, 2355, 69 L.Ed.2d 1, the Supreme Court held that a facial challenge only presents the straightforward issue of whether "the 'mere enactment' of the [legislation] constitutes a taking." Some courts have employed the

significance" in determining whether a government action constitutes a compensable taking are "(1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.'" *Connolly,* 475 U.S. at 225, 106 S.Ct. at 1026, *supra* (quoting *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)).

As to the severity of the economic impact, provisions of the new law, (1) will take away a significant portion of the value of contracts with terms of over two years in the special districts which will eventually be established, (2) may limit the value of contracts which are not granted a waiver, if the customer chooses to terminate them, and, (3) may limit the value of contracts which carters attempt to assign, if the customers choose to terminate them.

The first of these effects does not qualify as a taking because it does not deprive plaintiffs of all "economically viable use" of their property. *Kraebel v. NYC Dept. of Housing Preservation & Development,* 959 F.2d 395, 403 (2d Cir.), *cert. denied,* 506 U.S. 917, 113 S.Ct. 326, 121 L.Ed.2d 245 (1992). The time table for establishing special districts is unclear, making any damages from their establishment uncertain at best. Most contracts outside these districts will continue for up to two years, if the current terms of those contracts so dictate. This will provide carters with a significant portion of the revenue expected under the contracts.

 The second and third effects of the law produce only speculative damages, which depend upon the customer's possible action in terminating the contract, rather than any action of the state. Typically, speculative damages to future profits do not form the basis for a successful Takings Clause claim.[6] As the Federal Circuit court has held:

the plaintiffs do not complain that the [government action] resulted in a loss of income for services previously provided but not yet paid for, merely the loss of the contingent right to future income for services yet to be rendered. Such future damages are speculative and merely consequential to the valid exercise of governmental power.

*Chang v. United States,* 859 F.2d 893, 898 (Fed.Cir.1988); *See also Andrus v. Allard,* 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979) ("loss of future profits— unaccompanied by any physical restriction— provides a slender reed upon which to rest a takings claim").

In general, while this legislation may jeopardize the existence, or limit the terms, of some current contracts, it does not prevent carters from entering into new contracts. It does not impact the value of a carter's trucks, offices, and expertise and, assuming the carter receives a license, the statute leaves the business fully able to compete in the industry. As a result, Plaintiffs' challenge fails the primary test of a facial claim—whether the statute deprives Plaintiffs' property of all or nearly all of its value. *See Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 502, 107 S.Ct. 1232, 1250–51, 94 L.Ed.2d 472 (1987) (lack of proof that plaintiff could no longer operate a profitable business undermines takings claim).

In addition to the speculative nature of the economic impact of this legislation, Plaintiffs' challenge is also unsuccessful under the second of the *Penn Central* "as-applied" criteria—the interference with legitimate investment-backed expectations. As discussed previously in the context of the Contract Clause, where a contract relates to an industry in which significant regulation already exists, a contracting party cannot validly complain of frustrated expectations from a new regulatory scheme. *Connolly,* 475 U.S. at 226–27, 106 S.Ct. at 1026–27, *supra; FHA v. The Darlington, Inc.,* 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958) ("Those

factors the Court uses in its "as applied" decisions, such as *Penn Central,* to supplement the analysis of the facial question. *See General Offshore Corp. v. Farrelly,* 743 F.Supp. 1177, 1203 (D. Virgin Islands 1990).

6. This is particularly true for facial claims.

who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end").

Furthermore, "the fact that the plaintiffs were frustrated in making the most beneficial use of their services does not lead to the unavoidable conclusion that the governmental action rises to the level of a taking." *Chang,* 859 F.2d at 896. In a case in which a statute frustrated a plaintiff by resulting in the termination of a contract from which the plaintiff expected to derive profits, the Ninth Circuit held that there was no taking:

> as the Supreme Court said in *Omnia Commercial Co, Inc. v. United States,* 261 U.S. 502, 513, 43 S.Ct. 437, 439, 67 L.Ed. 773, 'Frustration and appropriation are essentially different things.' There was here no taking of [plaintiff's] property which entitled the company to just compensation under the Fifth Amendment.

*Monolith Portland Midwest Co. v. Reconstruction Finance Corporation,* 282 F.2d 439, 447 (9th Cir.), *cert. denied,* 364 U.S. 926, 81 S.Ct. 352, 5 L.Ed.2d 265 (1960).

Finally, with respect to the nature of the government action, under Local Law 42, the City of New York "does not physically invade or permanently appropriate any of the [Plaintiff's] assets for its own use." *Connolly,* 475 U.S. at 225, 106 S.Ct. at 1026, *supra.* In contrast to physical invasion cases, a taking is less readily found when the "interference arises from some public program adjusting the benefits and burdens of the economic life to promote the common good." *Keystone Bituminous Coal,* 480 U.S. at 489 n. 18, 107 S.Ct. at 1243 n. 18. When a law results in the termination of contracts between private parties, but leaves parties free to reach other contracts, the loss of contracts simply "is not the equivalent of an appropriation of [a company's] services" by the government. *See Chang,* 859 F.2d at 896; *Connolly,* 475 U.S. at 224, 106 S.Ct. at 1025–26, *supra* (Takings Clause not violated because the legislature "has taken nothing for its own use, and only has nullified a contractual provision").

■ Given: (1) the speculative nature of any losses on the part of the plaintiffs, (2) the

fact that any losses will be less severe than the total or nearly total loss of value required by the Supreme Court in Takings cases, (3) the heavily-regulated nature of the carting industry, and (4) the non-physical nature of the government action, which leaves most carters able to compete effectively in the industry and simply readjusts the balance of power between private business and carters, the plaintiffs' claim that Local Law 42 violates the Takings Clause is rejected.

## III. Due Process

### a. Termination Clause

Plaintiffs challenge the § 11 waiver provision on procedural due process grounds. That section states that any contract entered into by a trade waste removal business "shall as of 30 days following such effective date [of Local Law 42] be terminable by either party thereto upon thirty days written notice," unless the carter has "received a license from the New York city trade waste commission as established by section two of this local law," or applied to the Commission "to waive the termination clause requirement with respect to identified contracts." Applications are to include a statement why a waiver would not be inconsistent with the purposes of the act. In making a determination of whether the issuance of a waiver would be consistent with the purposes of the act, the Commission is to consider "background information concerning the business and its principals and the full circumstances surrounding the negotiation or administration of such contracts, including but not limited to the form and content thereof." Submission of the waiver application suspends the termination clause requirement discussed above.

■ In order to prevail on their facial challenge, Plaintiffs must show that the statute could never be applied in a constitutional manner. *See New York State Club Ass'n,* 487 U.S. at 11, 108 S.Ct. at 2233, *supra.*

■ Procedural due process generally requires "notice and an opportunity to be heard prior to the deprivation of a property interest." *United States v. Monsanto,* 924 F.2d 1186, 1192 (2d Cir.1991), *cert. denied,*

502 U.S. 943 (1991). However, the Fourteenth Amendment does not itself create a property interest. *Richardson v. Town of Eastover*, 922 F.2d 1152, 1156 (4th Cir.1991). In order to have a property interest in a benefit, "a person clearly must have more than an abstract need for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). These property interests are created and defined by "existing rules or understandings that stem from an independent source such as state law." *Id.*

By challenging the waiver provision, Plaintiffs contend that the statute grants the Commission the power to deprive them of their property interest in their pre-existing carting contracts without a hearing, because if the Commission does not grant them the waiver—a decision which may be made without a hearing—their contracts become terminable-at-will after thirty days.[7] Plaintiffs' argument is without merit, however, because § 11 of Local Law 42 provides

carters an alternative way of preventing their contracts from becoming subject to that section's termination clause: receipt of a new license. Plaintiffs do not dispute that the new license application scheme entitles them to a hearing. Thus, since the statute does not require the carters to avail themselves of a procedure which denies them the right to be heard before their contracts become terminable-at-will, Plaintiffs cannot meet their burden of showing that the statute could never be applied in a valid manner.[8] Thus, Plaintiffs' facial challenge to the waiver procedure fails.[9]

#### b. Contractual Term Limits

Plaintiffs challenge the two-year contract term limit of §§ 11(i)(ii) discussed above on due process grounds as well. Plaintiffs allege that, to the extent § 11 applies retroactively to contracts entered into prior to the effective date of Local Law 42[10], Plaintiffs will be deprived of much of their property interests in contracts that exceeded those terms. Plaintiffs also allege that reduction

---

**7.** Plaintiffs also allege that the standard governing the Commission's determination of whether to grant a waiver is unconstitutionally vague. Since the Court finds that the statute provides for other ways of preventing the termination clause from taking effect, it need not address this claim.

**8.** Plaintiffs contend that "[b]ecause of the large amount of information that must be assembled, submitted to and reviewed by the Commission on a license application, plaintiff carters cannot expect to obtain new licenses from the Commission within 30 days after LL 42's effective date. Therefore, every carter must apply for a waiver of the termination provision in order to prevent its existing term contracts from being terminable at its customers' option." Amended Complaint ¶ 27. However, a facial challenge is made in a "factual vacuum"; any factual determinations are irrelevant. *General Offshore Corp. v. Farrelly*, 743 F.Supp. 1177, 1188 (D.Virgin Islands 1990). Plaintiffs' claims are better left to an "as applied" challenge since they will not be ripe until a plaintiff has been denied a waiver or a new license. *See, e.g., Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81, 105 S.Ct. 3325, 3332–33, 87 L.Ed.2d 409 (1985) (a court is not to adjudicate "contingent future events that may not occur as anticipated, or indeed may not occur at all"); *Ohio v. Akron Center for Reproductive Health*, 497 U.S. 502, 512, 110 S.Ct. 2972, 2979–80, 111 L.Ed.2d 405 (1990) (citations omitted) ("courts should construe a statute to avoid a

danger of unconstitutionality ... Courts should not strike down a statute based upon a worst case scenario that may never occur"). For reasons stated below, however, the Court questions Plaintiffs' claims that due process would require that they be given a hearing even if they were forced to go through the waiver procedure.

**9.** Defendant also notes that waiver applicants may challenge a waiver denial in an independent hearing pursuant to NYCPLR Article 78, and that this satisfies the due process requirement. *See, e.g., Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54, 58–59 (2d Cir.1985) ("an outright violation of state law in the denial of a license will not necessarily provide the basis for a federal claim, at least when the applicant has a state law remedy"). Plaintiffs respond that Article 78 proceedings can often take up to two weeks to resolve, and in the meantime, their garbage will be accumulating. While Plaintiffs' concerns are legitimate, this Court is bound by the Second Circuit's warning that if the federal courts were to adjudicate all claims of disappointed state license applicants, it would "violate principles of federalism, promote forum-shopping, and lead to unnecessary state-federal conflict with respect to governing principles in an area principally of state concern." *Id.* at 59.

**10.** Plaintiffs do not contend that the City lacks the authority to impose two-year limitations on future contracts.

of the length of these contracts lessens the value of their businesses for purposes of sale or providing collateral, and adversely affects prior commitments such as capital investments and hiring decisions that they have made based on the duration of their pre-existing contracts. (Amended Compl. ¶ 22–23).

 It is not clear from Plaintiffs' papers whether their challenge is on grounds of procedural or substantive due process. To the extent that their claims rely on the former, it is well-established that a government's change in established policy, even if it works to an individual's commercial detriment, does not create entitlement to a hearing. *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 789, 100 S.Ct. 2467, 2477, 65 L.Ed.2d 506 (1980). "Otherwise, the government could never change prior policy without granting a predetermination hearing to those adversely affected." *Nuclear Transport & Storage, Inc. v. United States,* 890 F.2d 1348, 1354 (6th Cir.1989). For the reasons discussed above, the City had ample reason to restrict the duration of carting contracts. Thus the procedure due to the carters was accorded them in the legislature. *Chicago Bd. of Realtors v. City of Chicago,* 819 F.2d 732, 738 (7th Cir.1987).

 To the extent that Plaintiffs are making a claim on substantive due process grounds, it is "familiar law that legislative acts adjusting the burdens and benefits of economic life carry with them a presumption of constitutionality and that the person complaining of a due process violation must establish that the legislature has acted in an arbitrary and irrational manner." *Textile Workers Pension v. Standard Dye & Finishing,* 725 F.2d 843, 849 (2d Cir.), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984). Again, for reasons discussed above, the Court finds that the City had legitimate reasons for restricting carting contracts to terms of two years. Accordingly, Plaintiffs' claims fail on these grounds as well.

c. Auditor Appointment

Plaintiffs also challenge § 16–511(a) on due process grounds. That section states that the Commission:

may, in the event the background investigation conducted pursuant to section 16–508 of this chapter [the licensing application process] produces adverse information, require as a condition of a license that the licensee enter into a contract with an independent auditor approved or selected by the commission. Such contract, the cost of which shall be paid by the licensee, shall provide that the auditor investigate the activities of the licensee with resect to licensee's compliance with the provisions of this chapter, other applicable federal, state and local laws and such other matters as the commission shall provide by rule.

Plaintiffs contend that because this section does not require the Commission "to afford the applicant for a license a hearing prior to making its determination to require an independent auditor, nor does the statute require the Commission to provide notice and a hearing in the event that it decides to require an auditor," Amended Compl. ¶ 62, it deprives the Plaintiffs of procedural due process. Plaintiffs also allege that the standard "adverse information" is vague and overbroad.

Plaintiffs do not contend that applicants for a new license may be rejected without a notice and a hearing. Such a provision is provided by § 16–509. Thus, unlike their challenges to the termination provision and two-year contract limitation discussed above where Plaintiffs allege that they are being deprived of their interest in specific contracts, here the only "injury" that they can point to is the Commission's ability to require some carters to be supervised by an auditor (at the carters' cost) without providing them with a hearing. Stated in these terms, the "property interest" of which Plaintiffs claim to be "deprived" is a vague and amorphous interest—the right to continue to hold and/or obtain licenses on the same terms as they have done in the past, without the addition of any new requirements.

 This "interest" does not amount to a property right protected by the Due Process Clause. Plaintiffs do not deny that the state possesses the police power to control the garbage collection industry. Nor do they contend that the state is without the authori-

ty to require appointment of an auditor in specific cases to oversee individual carters as part of its overall regulatory scheme. Even if the former licensing scheme under the DCA had created a property interest in license renewal on similar terms, where the legislature has created a right through enactment of a statute, "it retains the power to enact new legislation altering or eliminating the right, and that elimination does not contravene the Due Process ... Clause[ ] of the Constitution." *Story v. Green,* 978 F.2d 60, 63 (2d Cir.1992).[11] *See also, Big Apple Food Vendors' Assoc. v. City of New York,* —— A.D.2d ——, ——, 638 N.Y.S.2d 540, 545 (N.Y.Sup.Ct.1995), *aff'd,* —— A.D.2d ——, 644 N.Y.S.2d 216 (N.Y.A.D. 1st Dep't, June 18, 1996) (cart vendors do not have a property interest in automatic renewal of licenses, even where the standard for renewal had always been lenient, because "[g]enerally, a license is subject to reasonable restrictions and to revocation by an issuing authority").

▆▆▆▆ Nor is the standard applicable to this determination unconstitutionally vague. Vagueness challenges under the Due Process clause are analyzed under two criteria: First, the provision must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Second, the "laws must provide explicit standards for those who apply them" to guard against arbitrary and discriminatory enforcement. *Id.* Because appointment of an auditor does not make any conduct unlawful, the focus is on the second prong.

The Supreme Court has stated:

[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test because its subject matter is more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legisla-

tion in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of a regulation by its own inquiry, or by resort to an administrative process.

*Village of Hoffman Estates v. Flipside Hoffman Estates Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) (footnotes omitted). The constitutional standard for vagueness is "the practical criterion of fair notice to those to whom the statute is applied." *American Communications Ass'n v. Douds,* 339 U.S. 382, 412, 70 S.Ct. 674, 691, 94 L.Ed. 925 (1950).

For purposes of determining whether the challenged provision is unconstitutionally vague, the standard of "adverse information" is not to be read in isolation, but should be interpreted in light of the factors delineated in § 16–508 for consideration in the license application process. There, the statute specifies what information it considers "adverse" for purposes of preserving the statute's intent. *See, e.g.,* § 16–508(b)(ii)(g) (criminal convictions); § 16–508(b)(ii)(i) (suspensions or revocations of permits or licenses). When read in their entirety, §§ 16–508 and 16–511 place carters on notice of what factors the Commission will consider when determining whether or not to require the appointment of an auditor.

d. Definition of "Applicant"

Finally, Plaintiffs allege that the statute is structured so that it defines "principal" of an entity applying for a license in a manner which makes anyone a principal if that person's children, grandchildren or parents own in the aggregate, 10% or more of the applicant, regardless of whether the person holds any ownership interest in the corporation. Since wrongdoing by any of these members may be considered in an applicant's "good character" in its license application, or grounds for revocation of a license, Plaintiffs argue that the imputation of wrongdoing violates substantive due process, and interferes

---

11. The Court does not address the question of whether the previous licensing scheme under the DCA created a property interest in carter licenses under the terms of those regulations.

with applicants' privacy rights.[12] (corrections in footnote below.)

 As discussed above, economic regulation passed pursuant to a local government's police power need only be rationally related to a legitimate governmental purpose. *Hertz Corp. v. City of New York,* 1 F.3d 121, 132 (2d Cir.1993), *cert. denied,* 510 U.S. 1111, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994). Local Law 42 seeks to weed out the influence of organized crime in the carting industry by scrutinizing the fitness of all applicants to hold licenses. Were individuals who had ownership interests in entities applying for a license able to evade the Commission's investigation by merely transferring ownership rights to a relative, the purpose of Local Law 42 would be defeated. Since there is a rational relationship between the legislative purpose and the means taken to put it into effect, the statute's definition of "principal" is not unconstitutional on its face. The same principle governs Plaintiffs' claims that the information sought is an intrusion on applicants' privacy.[13]

## IV. Freedom of Association/Privacy

Plaintiffs allege that several of the disclosure requirements in the license renewal application that specify the type of information that the Commission may consider when making licensing determinations violate their rights to freedom of expressive and intimate association. (Amended Compl.Claims 8–9.) Those provisions include: "knowing association with a person who has been convicted for a racketeering activity" or "association with any member or associate of an organized crime group as identified by a federal, state or city law enforcement or investigative agency when the applicant knew or should

have known of the organized crime associations of such person" (Code § 16–509(v.)–(vi.)); and prohibition on license-holders being members of or holding positions in any trade associations when they know: (1) such association or its predecessor has violated certain federal statutes relating to antitrust and racketeering activity, (2) a person in such trade association or its predecessor has violated certain of these federal statutes, (3) a person in such trade association or its predecessor is a member or associate of an organized crime group as identified by a federal, state or city law enforcement or investigative agency, (4) the trade association has failed to cooperate fully with the commission in connection with any investigation. (Code § 16–520(j).)

Plaintiffs also allege that the request for other information in the license application disclosure requirements is unreasonable and violates their right to privacy. (Amended Compl.Claim 5.) Such information includes: specified data about all persons having a beneficial interest in the applicant; a listing of the amounts in which such applicant is indebted, including mortgages on real property and the names and addresses of all persons to whom such debts are owed; information about such applicant's real property holdings or mortgage or other interest in real property other than a primary residence; information about mortgages, loans and instruments of indebtedness held by such applicant; information about any business in which such applicant owns an equity or debt interest; information about gifts valued at more than $1,000 received or made by the applicant in any of the past three years; a listing of all criminal convictions; a listing of all pending civil or criminal actions to which such applicant is a party; information

12. Where the license applicant is an "entity," each "principal" of the entity is considered an "applicant" as well. Code § 16–501(a). The term "principal" includes, in the case of a corporation, "every stockholder holding ten percent or more of the outstanding shares of the corporation" and "an individual shall be considered to hold stock in a corporation where such stock is owned directly or indirectly by or for i) such individual, ii) the spouse of such individual (other than a spouse who is legally separated ...) iii) the children, grandchildren or parents of such individual, and iv) a corporation in which any of

such individual, the spouse, children, grandchildren or parents of such individual in the aggregate own fifty percent or more in value of the stock of such corporation." Code § 16–501(d).

13. The Court does not hold that imputation of another's wrongdoing to an license applicant will always pass constitutional muster. In order to withstand a facial challenge, however, the Court need only find that the statute can be applied constitutionally under certain conditions—a standard that has been met.

about certain adverse determinations by federal, state or city regulatory agencies; information about certain criminal or civil investigations within the preceding 5–year period; information about the payment of taxes related to the applicant's business; information about any trade association in which the applicant is or has been a member or held a position and additional information concerning good character honesty and integrity that the Commission may deem appropriate and reasonable. (Code § 16–508(b).)

■ The Supreme Court has referred to two forms of "freedom of association":

> In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human-relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the first amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.

*Roberts v. United States Jaycees,* 468 U.S. 609, 617–18, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984). However, an individual's freedom of association may be curtailed to further significant governmental interests, especially those seeking to "eliminat[e] the public evils of crime, corruption and racketeering" from a regulated industry. *United States v. International Bhd. of Teamsters,* 941 F.2d 1292, 1297 (2d Cir.1991), *cert. denied,* 502 U.S. 1091, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992) (citations omitted).

Numerous cases have upheld the constitutionality of limitations on the right of individuals to associate with those who have been convicted of criminal activity. *See, e.g., International Bhd. of Teamsters,* 941 F.2d at 1297 (upholding sanctioning based on knowing association with members of organization involved in organized crime); *United States v. Albanese,* 554 F.2d 543, 546 (2d Cir.1977) (upholding probation condition to "associate only with law-abiding persons").

■ The type of illegal activity that Code § 16–520 allows the Commission to consider has been specifically tailored so as to focus directly on the sorts of organized criminal activity that the statute was intended to eliminate from the industry. Moreover, Code § 16–520(j) specifically grants the Commission the authority to "permit a licensee to be a member of such a trade association upon a determination by the commission that such association does not operate in a manner inconsistent with the purposes of this act." Thus the statute is tailored at effectuating legitimate government concerns without unduly infringing on the associational rights of the applicants. The Court accordingly finds that the statute may be applied in a constitutional manner and does not present a facial infringement on the rights to the freedom of expression of license applicants.[14]

Finally, with regard to Plaintiffs' claims of privacy, Plaintiffs' challenge is assessed under an intermediate, or balancing, analysis. *Igneri v. Moore,* 898 F.2d 870, 873 (2d Cir. 1990). So long as the disclosure "is designed to further a substantial governmental interest and does not land very wide of any reasonable mark in making its classifications," it will be upheld. *Id.* (citations omitted). For reasons discussed above, the Court finds that the disclosure requirements of Local Law 42 are sufficiently tailored to

---

14. For reasons similar to those stated above, the Court also finds that Plaintiffs cannot show that Local Law 42 is overbroad with respect to the freedom of association. "Application of the overbreadth doctrine ... is, manifestly, strong medicine. It has been employed by the Court sparingly and only as a last resort." *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). License applicants, on a vote of the Commission, are given the right to explain their associations with given individuals and organizations at a hearing before final denial of licenses. (Code § 16–509.) This avoids any general "chilling" effect.

To the extent that Plaintiffs seek to challenge the right to intimate association on overbreadth grounds, they lack standing. *See, Hvamstad v. Suhler,* 727 F.Supp. 511, 517 (D.Minn.1989), *aff'd,* 915 F.2d 1218 (8th Cir.1990).

the City's legitimate interests to survive constitutional scrutiny.

### Conclusion

Plaintiffs urge that "simply because some persons in an industry may have been corrupt does not justify taking away even those persons' constitutional rights, much less the rights of everyone in the industry." We agree.

Those carters who misused the legitimate business opportunities of this industry besmirched and submerged the interests and welfare of the legitimate carters. The surgery performed by Local Law 42 clearly was essential, overdue and carefully tailored to protect the public interest with measured consideration of the interests and welfare of those who strive only for fair business conditions. The therapy administered should ultimately work well for them, as well as the general public. The public interest required drastic corrections—the police power of the City provided the means.

In the light of all of the foregoing, it is

ORDERED that Plaintiffs' motion for a preliminary injunction be and the same is denied in all respects and Defendant's motion for summary judgment of dismissal of the Amended Complaint be and the same is granted. Costs to the Defendant.